UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

STEPHEN MICHAEL DICKS,

                    Plaintiff,

v.                                                    Case No. 3:23-cv-409-MMH-MCR

DEPUTY ROBERT FIPPS,

                    Defendant.

_____

## ORDER

### I. Status

Plaintiff Stephen Michael Dicks, a state inmate of the Florida penal system, initiated this action in the Northern District of Florida by filing a Civil Rights Complaint under 42 U.S.C. § 1983 on April 3, 2023 (mailbox rule). Doc. 1. On April 10, 2023, the Honorable Michael J. Frank, United States Magistrate Judge, transferred the case to this Court. Doc. 4. Dicks is proceeding on an Amended Complaint against one Defendant – Deputy Robert Fipps – and sues him in his individual and official capacities. See Doc. 37; AC. He asserts Defendant Fipps violated his rights under the Fourth Amendment when he illegally searched Dicks's cell phone.

This matter is before the Court on Defendant Fipps's Motion for Summary Judgment (Doc. 72; Motion), with exhibits (Docs. 70-1 to 70-8; 71-1).

The Court advised Dicks of the provisions of Federal Rule of Civil Procedure 56, notified him that the granting of a motion for summary judgment would represent a final adjudication of this case which may foreclose subsequent litigation on the matter, and permitted him to respond to the Motion. See Order (Doc. 15); Summary Judgment Notice (Doc. 74). Dicks responded to the Motion (Doc. 78; Response), with exhibits (Doc. 79-1). Defendant filed a Reply (Doc. 81; Reply); and Dicks then filed supplemental exhibits to his Response (Docs. 84; 84-1).[1] The Motion is ripe for review.

## II. Dicks's Allegations[2]

Dicks asserts that on January 12, 2019, he called Florida Department of Law Enforcement (FDLE) Agent Mike Clark and reported that Officer Charles W. Townsend, Jr., of the Union County Sheriff's Office (UCSO), stole Dicks's cell phone during an illegal traffic stop. AC at 5. According to Dicks, in the early morning hours of January 13, 2019, Dicks called 911 because he was experiencing a disturbance at his home in Columbia County, Florida, and

---

[1] Fipps has filed a Motion to Strike Dicks's supplement. See Doc. 85. Although Dicks filed the supplement without the Court's authorization, the Court will deny Fipps's Motion to Strike (Doc. 85) to the extent that it will consider the supplemental exhibits.

[2] For the purposes of resolving Defendant Fipps's Motion, the Court views all disputed facts and reasonable inferences in the light most favorable to Dicks. However, the Court notes that these facts may differ from those that ultimately can be proved at trial. See Lee v. Ferraro, 284 F.3d 1188, 1190 (11th Cir. 2002).

Defendant Fipps responded to the call.[3] Id. Dicks states that later that day, while in Columbia County, Florida, Dicks called 911 again because Officer Townsend and a group of his friends were threatening Dicks. Id. Dicks contends that he was then arrested and transported to Union County Jail. Id. at 5-6. Dicks alleges he was then charged with one count of attempted second degree murder and one count of carrying a concealed weapon for the events that occurred in the early morning hours of January 13, 2019. Id. at 6.

Dicks went to trial in February 2020, and during Defendant Fipps's trial testimony, the state introduced a picture of an incriminating Facebook message displayed on the cell phone that Dicks had reported stolen on January 12, 2019. Id. at 6-7. The state asked Defendant Fipps, "Did you take this picture?" and Defendant Fipps testified, "The phone was unlocked that is where I got the evidence from." Id. at 7. The picture showed a Facebook message exchange between Dicks and Joshua Sandlin. Id. Defendant Fipps testified to the content of the incriminating message exchange, in which Sandlin asked Dicks, "What happened?" and Dicks responded, "They jumped me, I did not have a choice." Id. at 7-8. According to Dicks, Fipps obtained this evidence after a warrantless, illegal search of Dicks's cell phone and Dicks did

---

[3] Although the allegations in his Amended Complaint are not clear, the record evidence shows that after Officer Townsend took Dicks's cellphone, Dicks obtained a second cellphone that he used to call 911 on January 13, 2019.

not learn of the Fourth Amendment violation until Fipps testified at trial on February 5, 2020. Id. at 9-10.

Dicks also maintains that Sandlin was in jail between November 20, 2018, and March 15, 2019, so Sandlin must have sent the message after his release. Id. at 8. Dicks contends he was in jail at the time of Sandlin's release but he had given his mother access to his Facebook account, so she could respond to all his unanswered messages. Id. As such, Defendant Fipps had to have conducted his warrantless, illegal search of the cell phone sometime after March 15, 2019. Id. at 9. Regardless, Dicks alleges that officers have had custody of his cell phone since he reported it stolen on January 12, 2019, the state did not disclose this Facebook post before trial, and Dicks did not discover his rights were violated until Defendant Fipps's February 5, 2020 trial testimony. Id. at 10-11. As relief, Dicks requests punitive damages and declaratory relief. Id. at 12.

### III. Summary Judgment Standard

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only),

admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A).[4] An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-moving party. <u>Mize v. Jefferson City Bd. of Educ.</u>, 93 F.3d 739, 742 (11th Cir. 1996) (quoting <u>Hairston v. Gainesville Sun Publ'g Co.</u>, 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." <u>Kesinger ex rel. Est. of Kesinger v.</u>

---

[4] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

<u>Id.</u> "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." <u>Campbell v. Shinseki</u>, 546 F. App'x 874, 879 n.3 (11th Cir. 2013). Thus, case law construing the former Rule 56 standard of review remains viable.

In citing to <u>Campbell</u>, the Court notes that it does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. <u>See</u> <u>McNamara v. GEICO</u>, 30 F.4th 1055, 1060–61 (11th Cir. 2022); <u>see generally</u> Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial. See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593–94 (11th Cir. 1995) (internal citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)). "Summary judgment is improper, however, if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party." <u>Guevara v. NCL (Bahamas) Ltd.</u>, 920 F.3d 710, 720 (11th Cir. 2019) (quotation marks and citation omitted).

## IV. Summary of the Parties' Positions

<u>Defendant Fipps's Motion & Evidence</u>

Defendant Fipps argues he is entitled to summary judgment because he did not conduct an unlawful search of Dicks's cell phone. Motion at 2. Instead, according to Fipps, the photograph in question is a "photograph[] of [] Fipps['s] phone used to search [Dicks's] publicly available Facebook page." <u>Id.</u> Fipps also asserts that even if the Court finds a factual issue exists regarding whether Defendant Fipps conducted an illegal search of Dicks's cell phone, Fipps is still entitled to summary judgment because Dicks filed this action after the expiration of the four-year statute of limitations. <u>Id.</u> And he contends that Dicks fails to state an official capacity claim against him. <u>Id.</u> at 17-20. In support of his arguments, Fipps relies on the following evidence.

In his affidavit, Defendant Fipps explains:

> I am employed as a Deputy Sheriff with the [UCSO]. I was a deputy sheriff on January 13, 2019, when I interacted with Stephen Michael Dicks.

> On January 13, 2019, I was dispatched to the intersection of highway 100A and Northwest 141st Street in rural Union County in response to a reported physical disturbance.

> Upon arriving on scene at 12:26 a.m., I contacted a white male, Sidney Keen, standing on the side of the

road, bleeding from multiple stab wounds to the left side of his lower body. I was the second officer on scene. Fish and Wildlife Officer Christopher Douglas arrived before me.

I remained with Mr. Keen until he was loaded into an ambulance and left the scene to be transported to UF Shands to be treated for his significant and life-threatening injuries. Mr. Keen left approximately twenty-two minutes after I arrived on scene at 12:48 a.m.[] While caring for Mr. Keen I took six photographs documenting the injuries sustained by Mr. Keen. All six photographs were taken between 12:29 and 12:33. Based on the time I arrived on scene, coupled with the time that Mr. Keen and I were on scene together, I know that the timestamp on the photograph is approximately one hour later than the time the photo was taken.[FN]

> [FN] I am unsure as to exactly why the time stamp on the photos is one hour and five minutes ahead of the actual time. It is likely that the time on the camera was manually set when the camera was first purchased and never updated for when the time adjusted back an hour. The time stamp on all of the photos is one hour and five minutes ahead of the actual time the photographs were taken.

After taking care of Mr. Keen, I was notified by dispatch that the other participant in the fight, identified as Stephen Michael Dicks, was located on his property awaiting law enforcement's arrival. I was notified that Mr. Dicks may have suffered a head injury.

I then entered Mr. Dicks['s] property along with Officer Douglas and Deputy Scott Andrews and made contact with Stephen Michael Dicks. Mr. Dicks was first contacted by law enforcement on January 13,

8

2019, at 12:57:42 a.m. [Mr. Dicks] was placed in handcuffs for officer safety[,] briefly triaged for injuries[,] and questioned as to his involvement in the altercation.

While speaking with Mr. Dicks I observed a small cut above [Mr. Dicks's] left ear. I photographed [Mr. Dicks's] injuries on scene at 1:12 a.m. EMS conducted a check on Mr. Dicks and found that his blood pressure was elevated. [Mr. Dicks] was released from handcuffs and at 1:29 a.m. transported to Lake Butler Hospital for further evaluation.

After [Mr. Dicks] left the scene, I interviewed five eyewitnesses. Three witnesses, Nathan Pierce, James Reger, and Christen Pierce gave nearly identical statements. All three recounted that the three of them and Mr. Keen had been riding their ATVs by [Mr. Dicks's] home when they observed [Mr. Dicks] outside.

The group stopped to speak with [Mr. Dicks] about stolen property. An argument ensued which then devolved into a physical wrestling match between [Mr. Dicks] and Mr. Keen.

While the two were wrestling, [Mr. Dicks] brandished a knife and stabbed Mr. Keen multiple times.

After the stabbing, the group separated the altercation and law enforcement was called. In addition to the above information, one of the witnesses informed me that [Mr. Dicks] had posted about the altercation and incident on his Facebook page.

I then travelled to Lake Butler Hospital where I arrived at 1:49:55 and contacted Mr. Dicks to obtain a statement from him. Mr. Dicks confirmed the account of the three witnesses, recounting that a confrontation broke out near his property between himself and Mr.

Keen related to stolen property. Mr. Dicks claimed that he was wrestling with Mr. Keen when the other members of the group began kicking him.

After being ganged up on by all four individuals Plaintiff stabbed Mr. Keen with a knife to get him off him and then retreated to his property once he was free.

I again documented [Mr. Dicks's] injuries with two additional pictures taken at the hospital at 1:59 a.m. and 2:02 a.m. I did not arrest [Mr. Dicks] at that time but left him in the care of the hospital who indicated they intended to transport [Mr. Dicks] to Lake Mary Hospital to have a C.T. Scan. I did not seize or confiscate any of Mr. Dicks'[s] personal property, including his cell phone. I left the hospital and returned to the Sheriff's Department.

After completing my interview of Mr. Dicks I utilized my department issued cell phone and conducted a search of [Mr. Dicks's] Facebook profile and observed that he had made two posts regarding the stabbing incident and subsequent investigation.[5]

---

[5] In this case, the parties discuss two Facebook messages on Dicks's Facebook profile that are about the January 13, 2019 stabbing. In his Response, Dicks clarifies that this lawsuit only involves the "staged the shot" post that Defendant Fipps discussed during his trial testimony, Response at 2, and thus, for ease, the Court's summary of the evidence only discusses that post.



The above post is currently on [Mr. Dicks's] publicly available Facebook page at https://www.facebook.com/mike.dicks.7. The post has a time stamp of January 13, 2019, at 12:38 a.m. I observed this post on Mr. Dicks'[s] Facebook page when I utilized my phone to search his Facebook account on January 13, 2019. Concerned that Mr. Dicks may delete the post, I took two photographs of my phone which was displaying the Facebook post utilizing my department issued camera. These photographs were taken at 2:15 a.m.

. . . .

I then prepared an incident report documenting my investigation and checked all photographs into evidence. [Mr. Dicks] walked away from the hospital against medical advice at approximately 4:00 a.m. that morning. I had no further involvement or interaction with [Mr. Dicks] since that time.

Approximately eight hours later, Deputy David Gladding traveled to Mr. Dicks'[s] residence. Deputy Gladding located Mr. Dicks at his residence and placed him under arrest for an unrelated charge of misdemeanor possession of paraphernalia, and felony

possession of a firearm/ammunition[] from a prior investigation conducted by Deputy Townsend.

[Mr. Dicks] was charged with second degree attempted murder and carrying a concealed weapon by information on February 20, 2019.

Just over one year after the initial incident, on February 5, 2020, [Mr. Dicks] underwent a trial by jury on his criminal charges. I was called as a witness by the Assistant State Attorney Shawn Thompson.

During Mr. Thompson's recross, I was asked several questions regarding one of the photographs I took of my phone. The photograph that I was shown was a printed copy of the below photo



When I was first shown the photograph, I had no recollection of taking the photo, indicating that I may have taken the photograph.

When asked "at any point did you look at his phone" I answered "It was unlocked. That's where I got the evidence photo from." I was mistaken as to my testimony. I never looked at Mr. Dick[s]'s phone, the evidence photograph came from me taking a picture of my phone when it was on his unlocked Facebook account. My testimony that his phone was unlocked was in error.

Again, my testimony later in redirect where I answered positively that I remember taking a photo of his phone, is in error. I took a photograph of my own phone. At trial, the question of whose phone was depicted was not an important detail, rather, the information I was focused on was the content of Mr. Dick[s]'s admission on Facebook that he had staged the shot.

My confusion as to the nature of the photo at the time of trial can be further observed on re-re-direct where I indicated that the post had a "time stamp" on it of 2:15 a.m., when that time is clearly the time on the phone when the photograph was taken.

I had not seen or thought about the photographs in question in over a year since taking them. I had not reviewed the photograph prior to my trial testimony. Since being sued by Mr. Dicks, I have reviewed the color copies of the photographs, as well as reviewed all three pictures of the Facebook posts. Each photo was taken on January 13, 2019 at 2:15 a.m. after I had interviewed Mr. Dicks at the hospital. Each photograph is a picture of my cellular phone being used to search Mr. Dicks['s] publicly available Facebook profile.

13

The phone depicted in the photograph is an iPhone 8 Plus. On January 13, 2019, I owned an iPhone 8 [P]lus.

On September 20, 2018, I purchased a Zizo Bolt Series iPhone 8 Plus Military Grade Case, in colors sand and white.

The case in the photographs is the same color and design as a Zizo Bolt.

On January 13, 2019, I utilized Verizon Wireless as my cell phone service provider. The phone in the photograph is a Verizon wireless phone. After having the opportunity to review all three photographs I am 100% certain that the phone depicted in the pictures is my phone.

Doc. 70-2 at 1-10 (paragraph enumeration and attachment citations omitted).

Fipps provides color photographs of his cell phone displaying the subject Facebook post (id. at 25-27); an incident report for the January 13, 2019 events (id. at 28-32); an incident report for the January 9, 2019 events (id. at 33-36); and Fipps's Amazon receipt for the September 20, 2018 purchase of a Zizo Bolt Series iPhone 8 Plus Case Military Grade (id. at 56).[6]

---

[6] In his declaration, Defendant Fipps also contends that he provided the Court with a "Flashdrive" containing recordings of "SO Radio Audio File 1028999" (Doc. 70-2 at 19) and "SO Radio Audio File 102931" (Doc. 70-2 at 22). However, Defendant Fipps only provided the Court with one Flashdrive that contains two 911 recordings (Docs. 70-1, 70-3).

Fipps also provides an excerpt from his testimony given at Dicks's

criminal trial. Id. at 37-55. As to the subject cell phone photograph at issue, on

redirect, Fipps testified:

> Q     Do you know how long after you got dispatched
> you came into contact with Mr. Dicks?
>
> A     Once the scene was secured and we got Mr. Keen
> away, it was roughly about 15 minutes prior to -- with
> our arrival until we were able to make contact with
> Mr. Dicks.
>
> Q     Okay. So he had several minutes when he was
> not at the scene to do certain things to himself, to stage
> things?
>
> A     He could have, yes.
>
> Q     While on scene, did you see any correspondence
> from Mr. Dicks with anybody talking about staging the
> shot?
>
> A     No.
>
> MR. THOMPSON: Your Honor, may I approach the
> witness?
>
> THE COURT: You may.
>
> BY MR. THOMPSON:
>
> Q     This is a picture you took?
>
> A     Yes, I may have.
>
> Q     And if you would have taken this photo, would
> this help refresh your recollection as to correspondence
> he may have had with somebody else?

A    He may have.

Q    Does this refresh your recollection as to a statement he made at the beginning?

A    Not right offhand.

Q    **At any point did you look at his phone?**

A    **It was unlocked. That's where I got the evidence photo from.**

Q    Did you see the statement at the beginning of that phone?

A    I don't recall.

Q    So did you take this photo?

A    Yes.

Q    And this is a photo that you observed at that particular day?

A    Yes.

Q    Did you read the first line of that statement?

A    I don't recall

MR. THOMPSON: May I approach again, Judge?

THE COURT: You may.

BY MR. THOMPSON:

Q    Did you take that photo?

A    Yes, I did take the photo.

Q    And is there a statement in that photo –

16

MR. SALTER: Your Honor, we object to this. I think refreshing has failed at this time.

THE WITNESS: Yes.

THE COURT: I'll allow the question without going over any statement, but just the question about refreshing or not.

BY MR. THOMPSON:

**Q    Do you remember taking a photo of his phone?**

**A    Yes, I do.**

Q    Without knowing exactly what's in there, does this clearly and accurately represent the statements that you observed that Mr. Dicks made to somebody else?

A    Yes.

Q    Inside that first line of that statement, does it mention anything about staging?

A    Yes.

Q    Does this help refresh your recollection or help demonstrate what Mr. Dicks may have said to somebody else on that particular phone?

A    Yes.

Q    And what does it say, if you can recall?

A    That he staged the shot.

Doc. 70-2 at 46-48 (emphasis added). The excerpt also includes Dicks's trial

attorney's cross-examination of Fipps regarding the photograph, eliciting

testimony that the Facebook post included a comment from "Joshua Sandlin"

who asked, "What happened?" and Dicks's response that "They jumped me" to

support Dicks's self-defense theory at trial. Id. at 53.

Defendant Fipps also provides Polaris Investigations & Consulting

LLC's October 1, 2024 social media investigation report. See Doc. 70-5.

According to the "Investigative Summary":

> Stephen Michael Dicks, aka Mike Dicks, was found on
> Facebook with a PUBLIC profile, visible to anyone
> who can access the platform. We were requested to
> obtain the full screenshot of the subject's public post
> from January 13, 2019. During our research we found
> that the post was likely created on that date, at
> 12:38am, as other comments found on that post were
> subsequent to that time on January 13th. The post
> remains public and open for public comment as of the
> date of this report.
>
> Though Facebook does allow users to change dates on
> posts, comments themselves are not affected by the
> date change because comments are date stamped by
> Facebook's system servers. . . .
>
> It was noted that he also uploaded a photo of what is
> assumed to be police lights in the dark, uploaded on
> January 13, 2019 at 12:42am. The first comment by
> Mike Dicks is date stamped January 13, 2019 at
> 12:45am.
>
> Additional posts were also saved with the date/time
> stamp to show additional content that exists in Public
> view.

Doc. 70-5. Attached to the report are several screenshots of Dicks's Facebook page with time stamps associated with posts and comments. Id. at 3-8. One screenshot is of the post at issue here – "I just staged the shot o.o UT of someone attacking me I'm probably going to jail but 8 on 1 is bad odds" – with a timestamp of January 13, 2019, at 12:38 a.m. Id. at 5. The investigator notes that the profile for "Joshua Sandlin" is no longer shown but has been changed to the name "Jade Sanchez" who makes the remark, "What happened" with a timestamp of January 13, 2019, at 12:39 a.m.[7] Id. at 3-5.

Defendant Fipps also provides the "Union County Jail Inmate Personal Property List" completed on January 13, 2019, which lists the items officers took from Dicks upon his arrest. Doc. 70-6. The items listed are blue jeans, a t-shirt, and a cell phone. Id. Fipps also includes a "Release of Property" form, in which Dicks gave written consent for officers to release his blue jeans, t-shirt, and cell phone to Michele Dicks. Doc. 70-7. And Fipps includes the transcript of Dicks's October 17, 2024 deposition. See Doc. 71-1.

Dicks's Response & Evidence

Dicks argues that there are genuine issues of material fact that preclude entry of summary judgment for Defendant Fipps. See Response at 2. Dicks

---

[7] According to the investigator, the profile for "Jade Sanchez" appears to have been created in 2015 and does not mention "Joshua Sandlin." Doc. 70-5 at 13.

notes that while Fipps, in his Motion, contends that three photographs form
the basis of this lawsuit (see Motion at 7), Dicks clarifies that this lawsuit is
focused only one photo – the photograph of Fipps holding a cellphone showing
a post on Dicks's Facebook that states, "I just staged a shot 0.0 UT of someone
attacking me. I'm probably going to jail, but eight on one is bad odds." Id. at 2
(citing Doc. 70-2 at 25). According to Dicks, the cell phone depicted in the
subject photograph is the cell phone that Officer Townsend stole from him. Id.
at 4 (citing Doc. 70-2 at 25).[8] He states that in the background of the color
photograph, "a vehicle and double yellow lines" are visible and the time on the
phone screen shows the photo was taken at 2:15 a.m. Id. at 4. Dicks maintains
that since Fipps was at the hospital with him between 1:55 a.m. and 3:00 a.m.,
"[a] reasonable jurist could [] infer that [] Fipps'[s]" timeline is incorrect
because "there are no highways or double lines running through the middle of
the Lake Butler Hospital." Id. He also maintains that Fipps's own evidence
that the October 1, 2024 social media investigation revealed that "Jade
Sanchez" and not "Joshua Sandlin" commented on the subject post also
undermines Fipps's position. Id. at 7. Dicks argues that Fipps's trial testimony
is true and should be considered a confession that he unlawfully searched

---

[8] He also alleges that the photograph of the cell phone depicted in Doc. 70-2 at
27 is a separate cell phone that Dicks used to call 911 after the stabbing. Response at
4-5.

Dicks's cell phone, and the discrepancy in his trial testimony and his affidavit "alone precludes summary judgment." <u>Id.</u> at 8-10. Dicks also argues that Defendant Fipps is not entitled to summary judgment because the four-year statute of limitations did not accrue until Dicks heard Fipps's trial testimony about illegally searching his phone. <u>Id.</u> at 2, 10-12. And he contends Fipps is not entitled to summary judgment on his official capacity claim because he has "sufficiently pled facts that show [] the constitutional violation was the result of an official policy, custom, or practice of the Sheriff's Office." <u>Id.</u> at 13. In support of his argument, Dicks relies on the following evidence.

In his written declaration, Dicks maintains:

> While I was living in Union County, I fell victim to aggravated stalking at the hands of [a] criminal gang. It started with receiving a series of credible threats from Ernest Pearce the Patriarch of this "Criminal Gang" around December 22, 2018. [UCSO] refused to help due to the association with Mr. Pearce. The threats started because Mr. Pearce's son, Ernest, Jr.[,] was arrested for driving my car with a suspended drivers license in December, 2018. Mr. Pearce blamed me for the arrest because it was my car. The arrest took place in Columbia County, Florida
>
> On December 30, 2018, Mr. Pearce's son, E[]rnest Pearce, Jr. and his partner Michael Allen Sodler tried to run me and my girlfriend off the highway. I called 911 and Deputy Erik Krueger responded. Mr. Krueger after responding refused to file a report due to Mr. Pearce and Michael Sodler being associated with the same criminal gang.

On January 8, 2019, I was pulled over by Deputy Charles W. Townsend, Jr. in an illegal traffic stop. Mr. Townsend threatened me and wanted me to leave Union County. During the traffic stop my cellular phone was stolen.

I then tried to report the robbery to [UCSO] but I was told that I did not have the right to report a cop for theft.

On January 9, 2019 I was confronted about an alleged burglary of Ernest Pearce's vehicle by Mr. Townsend. Mr. Townsend assisted Columbia County Sheriff[']s Office and filed the report in [UCSO] I9000025. Mr. Townsend excluded from his report that Chelsea Croft who was present informed him that the [travel trailer] belonged to her husband Aaron Croft, who works for the Florida Department of Corrections. Ms. Croft also informed Mr. Townsend that the alleged narcotic equipment also belonged to her husband, as evidenced by his ATM card being in the box.

At that point I called the FBI office in Jacksonville, Florida and spoke to an agent about Mr. Townsend and his criminal gang. I was referred to the [FDLE].

I then got ahold of Special Agent Mike Clark after speaking to a female agent in the Jacksonville, Florida office. I explained to Mr. Clark that I was being victimized by the ATV's gang and about Mr. Townsend's theft of my cellular phone. Mr. Clark advised me that the [UCSO] had its own set of rules and he could not help me, but he was willing to meet me on the coming Tuesday.

On several occasions I have witnessed Mr. Townsend in the pack of ATVs on my family's property and made them leave. The only reason that I was living in Union County on January 13, 2019 at the time that I was attacked was to monitor the property for my family,

specifically to keep the house from being used as a
meth lab and to keep the ATV gang off of the property
due to the poor quality of law enforcement in the area.
My family are of the belief that gangs are for cowards
and refused to join the local gang.

At around 12am, I pulled my car down close to the road
that runs through the middle of the property, so that
I could get a phone signal and call my family. While I
was on the phone, I was surrounded by this criminal
gang, and I was attacked and kicked approximately 75
feet to the road and I was able to take a knife and
defend myself, or else I was going to die.

Mr. Keen and his gang were so drunk I reported to 911
that the group smelled of alcohol. Mr. Keen's blood
alcohol level an hour later was still .273 according to
the hospital.

After calling 911 the criminal gang fled to the main
Highway and went around a sharp curve in the
highway traveling southbound on Hwy 100A,
traveling with Lt. Christopher Douglas. I then
reported to 911 that [UCSO] travelled past my house
to meet the criminal gang. I was advised by 911 to stay
at my house and wait for Law Enforcement. It took
Law Enforcement approximately 5 minutes to arrive
at my house after I got off the phone with 911. I was
then placed in handcuffs at approximately 12:30am.
Approximately an hour later I was placed in an
ambulance and allowed to go to Lake Butler Hospital.

Defendant Fipps followed the ambulance to Lake
Butler Hospital where we both arrived at
approximately 1:45am. Mr. Fipps did not leave the
Lake Butler Hospital until approximately 3:10am.
Before Mr. Fipps left the hospital he advised me that
when he left I needed to sign out of the hospital and
leave town before Charles W. Townsend, Jr. got his
hands on me. Mr. Fipps advised that he was going

23

back to the Sheriff[']s Office and I would not be
bothered by him. When I left the hospital I got out of
the car and walked by [UCSO] and discovered that Mr.
Fipps was there as promised.

Approximately 8 hours later I was hunted down by Mr.
Townsend and his criminal gang while at my mother's
house in Columbia County, Florida.

I have recently contacted my family and I was advised
that on January 13, 2019, I was on a Verizon wireless
plan. I was also informed that the checkbook that
Charles W. Townsend, Jr. took from my car on
January 9, 2019 contained the receipts for my Verizon
service. The phone in the picture is also on the Verizon
plan. After reviewing pictures of the phone I am
positive that it is my cellular phone.

I have reviewed Mr. Fipps['s] timeline of events on the
night in question. I have discovered that Mr. Fipps
misrepresented several facts:

> FWC was on the scene prior to the
> stabbing as I told 911.

> I was placed in handcuffs at 12:30am
> being secured in Mr. Fipps['s] vehicle at
> around 12:40am.

> I did not post anything to Facebook
> contained in the picture at the center of
> this claim and Mr. Fipps did not witness
> me on Facebook or my phone after I called
> 911.

> I arrived at Lake Butler Hospital at
> 1:45a[m], and Mr. Fipps arrived at the
> same time.

> Fipps could not have taken a picture of the

24

> phone @ 2:15am on January 13, 2019
> because he was in Lake Butler Hospital
> with me from approximately 1:55am until
> approximately 3:10am.
>
> Fipps did not finalize his report before
> leaving work. Further Fipps was still at
> the hospital with me at 3:10am.

It was not until after I called 911 to the Columbia
County Sheriff[']s Department, that [UCSO]
completed its report on incident UCSO19OFF000032,
according to the internal affairs report contained in
Defendant Fipps['s] employment file.

During the Defendant's taking of my deposition . . . on
October 17, 2024, I explained that the inmate property
list is a forgery. I did not initial the document and it is
not my signature on the document. I also provided
Capitol City Court Reporting [a]n ERRATA SHEET
explaining the fraud. I do not know why Mr. Fipps
excluded my signed ERRATA SHEET for a blank page.
I did not have a phone when I was booked into the
Union County jail on January 13, 2019[,] and after
reviewing the inmate release form[,] I am certain that
the inmate property items are a forgery as the writing
isn't my writing or my Mother's writing, where the
signatures are our writing.

Doc. 79-1 at 1-6 (paragraph enumeration and internal citations omitted).

Dicks provides several unrelated reports and documents to support his

allegations that he feared various officers and/or gang members and challenges

Defendant Fipps's timeline of the January 13, 2019 events. See generally

Doc.79-1 at 8-22; 23-116.[9] He also attaches Defendant Fipps's pretrial deposition taken in preparation for Dicks's state criminal case (see Doc. 79-1, 100-12) and his public records requests he sent to the FDLE along with the FDLE's respective responses (see generally Doc. 84-1).

## V. Analysis

### Fourth Amendment

The Fourth Amendment guarantees that people shall "be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. A search occurs for Fourth Amendment purposes not only upon physical trespass to a person or property, but "when government officers violate a person's 'reasonable expectation of privacy.'" United States v. Jones, 565 U.S. 400, 406 (2012) (quoting Katz v. United States, 389 U.S. 347, 351 (1967) (Harlan, J., concurring)). An individual has a reasonable expectation of privacy only if he can establish both a subjective expectation of privacy in the object of the search and "that society is prepared to recognize as reasonable" the expectation of privacy. City of Ontario, Cal. v. Quon, 560 U.S. 746, 756 (2010) (quotation marks omitted). And if an individual lacks a reasonable expectation of privacy, he cannot challenge the search. Id.;

---

[9] Because not all of that evidence is essential or necessary for the Court's analysis and adjudication of the issues here, the Court need not summarize those exhibits.

see <u>Presley v. United States</u>, 895 F.3d 1284, 1290 (11th Cir. 2018) ("[S]tanding

under the Fourth Amendment is not jurisdictional; instead, we analyze it as a

merits issue.").

Dicks's allegations supporting his Fourth Amendment claim are

anything but clear. He references two cell phones – one cell phone that Officer

Townsend stole from him during a traffic stop on January 7 or 8, 2019; and

another cell phone that Dicks used to call 911 immediately after the stabbing

on January 13, 2019. <u>See</u> Doc. 71-1 at 24-25. According to Dicks, however, this

lawsuit depends only on Defendant Fipps's illegal search of the cell phone that

Officer Townsend previously stole from Dicks. Response at 2-4 ("[T]his suit[]

only involves [the cellular phone stolen by Charles W. Townsend, Jr.] . . . .").

But Dicks fails to point to any evidence even suggesting Defendant Fipps ever

had access to or control over the cell phone Townsend allegedly stole from Dicks

on January 7 or 8, 2019.

Instead, in this case, Dicks's sole understanding of Fipps's alleged

intrusion into that cell phone is based on Fipps's trial testimony and Dicks's

belief that the photo shown to Fipps at trial depicted the cell phone that

Townsend stole. <u>See</u> Doc. 71-1 at 25, 45, 52-53. As stated, Fipps does not

dispute that at Dicks's criminal trial, he made statements suggesting that the

subject photo was of Dicks's cell phone. But Fipps now avers that his prior trial

testimony was incorrect. And he offers an affidavit explaining that the subject

27

photo was of Fipps's own cellphone displaying Dicks's public Facebook post. <u>See</u> Doc. 70-21-12.

Here, the undisputed evidentiary material shows that the primary purpose of the state eliciting trial testimony from Fipps about the photograph of the cell phone and Facebook post was to refute Dicks's position that he stabbed the victim in self-defense. Indeed, Fipps was not prepared to testify about whose cell phone was depicted in the photograph. In his affidavit, Fipps explains that he did not review the photograph prior to his trial testimony and he "had not seen or thought about the photograph[] in question in over a year since taking" it. Doc. 70-2 at 10. During trial, only once did counsel specifically ask Fipps if he took a photo of Dicks's cell phone; and in context, counsel's vague inquiry did not make clear whether Fipps searched Dicks's cell phone before taking the photo. <u>See</u> Doc. 70-2 at 48. While Fipps ultimately answered affirmatively to the question, Fipps initially stated he did not recall most of the details surrounding the photo. <u>Id.</u> Although counsel briefly attempted to refresh Fipps's memory, counsel never requested Fipps to exhaust his recollection. Thus, at trial, Fipps had no chance to correct his lapse in memory and reveal what he now clarifies in his affidavit. Instead, in the criminal proceeding, it was enough for the state to have Fipps simply testify to seeing the incriminating Facebook post and its contents. Whether the cell phone in

the photo belonged to Dicks or Fipps was ancillary to the main purpose of the trial testimony.

According to Fipps, after Dicks initiated this case, Fipps then thoroughly reviewed the photograph and verified that the photo was of his own cell phone searching Dicks's public Facebook profile. Doc. 70-2 at 10. To that end, Fipps's affidavit provides a suitable explanation for his mistaken trial testimony. See, e.g., Com. Underwriters Ins. v. Aires Envtl. Serv., LTD, 259 F.3d 792, 798 (7th Cir. 2001) (finding that a court on summary judgment may consider an affidavit that explains contradictory prior statements that resulted from confusion, mistake, or lapse in memory); Scottsdale Ins. v. Moreno, 133 F. App'x 415, 416 (9th Cir. 2005)[10] (finding district court erred in striking portion of summary judgment affidavit because it contradicted prior testimony where court ignored the context and relevant issues present when the prior testimony was adduced); Branch Banking & Tr. Company v. Weiser, No. 12-CV-21643-SEITZ/SIMONTON, 2013 WL 12093148, at *3 (S.D. Fla. May 14, 2013)[11]

---

[10] The Court does not rely on unpublished opinions as binding precedent; however, they may be cited in this Order when the Court finds them persuasive on a particular point. See McNamara v. GEICO, 30 F.4th 1055, 1060–61 (11th Cir. 2022); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

[11] The Court notes that although decisions of other district courts are not binding, they may be cited as persuasive authority. See Stone v. First Union Corp., 371 F.3d 1305, 1310 (11th Cir. 2004) (noting that, "[a]lthough a district court would

(denying motion to strike movant's supplemental affidavit supporting its summary judgment motion because the affidavit clarified mistakes in a prior deposition).

The record evidence also substantiates Fipps's position that the photograph depicts his own cell phone. Notably, Fipps offers sworn statements that he did not make contact with Dicks until about twenty-two minutes after he arrived on scene, which gave Dicks time to make the Facebook post. Doc. 70-2 at 2. Fipps explains that the witnesses he questioned at the scene informed him that Dicks posted about the stabbing on his Facebook, which prompted Fipps to timely search for those posts before Dicks deleted them. Id. at 4. Also, the cell phone in the photo is an iPhone with a heavy-duty case. Id. at 25. In his affidavit, Fipps states that "[o]n January 13, 2019, [he] owned an iPhone 8 [P]lus." Id. at 11. He also states that in September 2018, he bought a "Zizo Bolt Series iPhone 8 Plus Military Grade" case (id. at 11); and he provides the Amazon receipt showing he purchased that iPhone case, which looks identical to the one depicted in the subject photo (id. at 56). And likely of more import, Dicks himself provides the most unequivocal evidence that the cell phone depicted in the photo did not belong to him – he testified during his

---

not be bound to follow any other district court's determination, the decision would have significant persuasive effects.").

deposition that although he did not recall the exact type of cell phone he had in January 2019, he confidently stated "it wasn't an iPhone, I know that." See Doc. 71-1 at 19. Thus, to that end, because Dicks admittedly did not own the subject cell phone, Fipps could not have violated Dicks's Fourth Amendment rights as alleged.

The record also supports the conclusion that Fipps could use his own phone to see and photograph Dicks's Facebook post because Dicks's Facebook profile is public. Doc. 70-2 at 5. While Dicks testified during his deposition that his Facebook settings were private at the time of the stabbing (Doc. 71-1 at 54), meaning only his Facebook friends could see his posts, the record evidence and his later sworn statements contradict that assertion. Notably, Defendant Fipps provides a social media investigation report concluding that on October 1, 2024, the date the report was issued, Dicks had a public Facebook profile visible to anyone with access to the social media platform. Doc. 70-5 at 1. The investigator further explained that Dicks created the "staged a shot" post at 12:38 a.m. on January 13, 2019, and "[t]he post remains public and open for public comment as of the date of" the investigative report. Id. While the investigator was unable to conclusively determine if Dicks's Facebook profile was public on January 13, 2019, according to the screenshots of Dicks's Facebook profile that accompany the report, between 10:27 a.m. on January 13, 2019, and 11:06 a.m. on January 14, 2019, Robert Barker, Brandon Glass,

31

and Michelle Heaton made hostile comments on Dicks's subject post. See id. at

5-6. During his deposition, Dicks testified that he does not know Barker, Glass,

or Heaton, which refutes his assertion that his Facebook posts were only visible

to his friends at that time. See Doc. 71-1 at 55.

Notably, "[a] person cannot claim to have a legitimate expectation of

privacy in information that he or she shares with others, such as a service

provider or with the public through a social media profile." Paisley Park

Enterprises, Inc. v. Ziani, No. 18-CV-2556 (DSD/TNL), 2018 WL 6567828, at

*5 (D. Minn. Dec. 13, 2018) (citing Smith v. Maryland, 442 U.S. 735, 742

(1979)); see also Chaney v. Fayette Cnty. Pub. Sch. Dist., 977 F. Supp. 2d 1308,

1315 (N.D. Ga. 2013) (finding that the plaintiff "surrendered any reasonable

expectation of privacy when she posted a picture to her Facebook profile" and

chose to share it with her friends and her friends' friends). Thus, to the extent

that Dicks attempts to prove Fipps illegally searched his cell phone because he

would not have been able to see Dicks's Facebook posts otherwise, or to the

extent that he generally alleges Fipps illegally searched his Facebook profile,

the public nature of his Facebook defeats those arguments and overcomes any

expectation of privacy he had in that information.

On this record, the Court finds that Dicks does not present evidence

establishing a genuine issue of material fact on his claim that Defendant Fipps

illegally searched his cell phone or Facebook profile. If this case proceeded to

trial, Dicks would have only Defendant Fipps's prior trial testimony that he took a photo of Dicks's cell phone. But "a mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Herrington, 381 F.3d 1243 at 1247. Notably, Dicks points to no evidence that Fipps ever had access to the phone he contends Fipps searched. Additionally, Fipps's affidavit sufficiently clarifies the mistake in his trial testimony and the evidence he provides establishes that the photo is of his own cell phone. And significantly, Dicks has sworn that he did not own an iPhone at the relevant time. Likewise, the public nature of Dicks's Facebook profile demonstrates he had no reasonable expectation of privacy in the post and does not offer any support for his Fourth Amendment claim. As such, the Court finds no Fourth Amendment violation and Defendant Fipps's Motion is due to be granted.[12]

Accordingly, it is

**ORDERED AND ADJUDGED:**

1.    Defendant Fipps's Motion for Summary Judgment (Doc. 72) is **GRANTED**.

---

[12] Because the Court finds Defendant Fipps did not commit a constitutional violation, the Court need not address his statute of limitations or official capacity arguments.

2.    Defendant Fipps's Motion to Strike (Doc. 85) is **DENIED to the extent that** the Court considered Dicks's supplemental documents in support of his Response.

3.    The Clerk is **DIRECTED** to enter judgment for Defendant Fipps and against Dicks, terminate any pending motions, and **CLOSE** the case.

**DONE AND ORDERED** at Jacksonville, Florida, this 28th day of August, 2025.

MARCIA MORALES HOWARD
United States District Judge

Jax-7

C:    Stephen Michael Dicks, #V90068
       Counsel of record